Thank you. May it please the court, as I said, Anne McClintock on behalf of Anita Sharma. For the fraud jury instruction challenge where I wanted to start, it's important that we acknowledge that we do not challenge the sufficiency or the validity of the evidence or the validity of the false statement convictions. Those were the last four 9-12 counts. So it's important to focus that also that the government sees that the jury instruction given for the fraud counts, the intent to cheat, the intent to deceive or cheat was wrong. And it was plainly wrong after Shaw and after Miller. So the real question and where the focus has to be on is the last two elements of the Olano test and whether that affected the defendant's substantial rights and whether it caused a seriously affected the fairness, integrity or public reputation of the proceedings. And it is clear from the evidence that the jury instruction given removed an essential element that went to the core defense theory in these cases. So that namely that the defendants individually and collectively, at least my client, Ms. Sharma, believed when she was recruited to do this process that the Sings were going to take care of the mortgages. And the other component, so it removed that element from the jury's having to consider it because it used the disjunctive, excuse me. The jury also had the obligation to assess the guilt or innocence of each individual defendant. And the evidence regarding their intentions is different because of the evidence of what their role in this scheme was was different. So I think that assessment may have been very different for each individual defendant and the jury needed to take a look at it. So if we focus on the third and fourth steps of the Olano, the conditions, I would take a look at Ms. Sharma's admission. And in it, the government used it to say that she knew about the false statement. She knew that she told the FBI that the loan applications included false statements. Under the instruction given, that was sufficient in and of itself to convict her for all the fraud counts. Because it was whether you said something that was false and you didn't have to reach the question of whether she intended that to cheat the banks. But that admission also says that she got involved because when the equity in the houses went up, and this is at ER2, page 191. When the equity in the houses went up, I would make money and so would Sajid, referring to Sajid Singh. And in the government's closing, they admit and the evidence admits that there were mortgage payments made during this scheme. And even in Sajid Singh's closing, he pointed out there were 23 different mortgage payments made. So the only way that for my client, for Ms. Sharma to go into this, her intention clearly was to not give truthful statements in the banking paperwork. But it wasn't intending to cheat the bank because the only way she could grow equity in the house that was bought in her name. So that it could be sold when the equity rose was that the mortgage payments had to be made. That didn't work out very well and, you know, for a variety of reasons. But as far as deciding whether her substantial rights and the co-defendants' substantial rights were affected, this error went to the heart of the defense. So I'd say that there is clear that substantial rights are affected. Turning to the fourth Olano prong, the fairness, integrity, and public reputation, the error here clearly created a risk of unnecessary deprivation of liberty by convicting people of offenses that they were not guilty of under the law, given the fact. And it clearly denied them, the defendants, their constitutional right to have the jury, which is a core constitutional right at the heart of all criminal proceedings, to have the jury decide that thing. So I would say that we cannot decide, this court cannot clearly find beyond a reasonable doubt that a rational juror would have found the defendants guilty absent that error. So if there are no questions on that, I'm going to turn to the… Let me ask a question on that issue. Did you make an argument to the jury along the lines you just made? Yes, I believe so. I didn't reread the closing from Ms. Sharma, but the entire theory of defense was mortgage payments were made, the economy tanked, basically the real estate bubble burst, and so they were unable to get the renters that they expected to be able to cover the mortgage payments. That was the theory, that was the theme of the defense. But did you tie that, the argument, to no intent to cheat? It went to yes, basically yes, they had no intent to cheat. They did not have fraudulent… When you say basically, did you see it in the jury? I mean, you know, this evidence is proof that my client had no intent to cheat. I can't say for sure that it was phrased exactly that precisely. It certainly was that they had no intent to defraud. And given the instruction, the proper instruction for fraudulent behavior is that you have to have the intent both to deceive and to cheat. And since, yes, I think so. I mean, they did challenge the fraudulent statements as well, but that did not work. Are there any questions on that? Okay. All right, so for the suppression motion, I'm not going to touch on the timeliness. I think that's well tediously put out in the briefs. So the basic point I want to make with this is that you have someone who's not a native English speaker who has been approached first by the FBI. She responds, says, okay, here's this time when I can take a break at work, is what the record seems to suggest. And then they show up to her office, take her out of where she wants to meet at the conference room or the break room in their building, go to a car. And I'm not saying, and there is no evidence that they did this under any kind of physical duress. But the length of time, the fact that she asked a couple of times that she needed to get back to work and the questioning continued, the fact that it was a private environment in a parking lot away from everybody else, that all of those factors, that she's in the backseat, that she keeps getting asked questions even though she says she needs an attorney, all of those things tend to show that the interrogation was a product that was neither temporary nor brief nor public, and that overbore her willingness to be able to be there. So there was custodial, that she had no free will to be able to leave, or at least she felt that she was constrained in staying there. So I think it was custodial. I think the court erred in that. And that her statements, basically for the same reason, her statements were involuntary. I just want to touch, unless there are questions on that. Well, do you separately argue, say your custody argument fails, you separately argue that it was unduly coercive? I think when you have somebody who is, if you look at the unduly coercive, the involuntary language standards, it's did they overbear her free will not to confess, I mean, to be able to remain silent. And I think the totality of the circumstances is what you always have to look at. Given her English skills, they knew that she was not a native English speaker, and they chose not to bring an interpreter, they could have. They knew that they were going to confront her, that she wasn't just a witness they wanted to talk to. They knew they were going to challenge her and did with saying, you know, you're facing 30 years in prison, she's in tears. You know, they may have paused for half a moment, but they did not stop the questioning. So I think the totality of the circumstances indicate that it was involuntary. Anything else on that? Clearly not going to use my whole time. So I want to just switch to the minor participant. We mostly addressed this in the reply brief as far as the relative involvement. And I just wanted to point out that the government seems to be saying that all straw buyers are average and all sellers are minor as far as role in the offense. And it cannot be that categorical. I mean, when you take a look at the people that we know were involved in this thing, Ms. Sharma didn't recruit anybody. All her behaviors were following what the things told her, at least Surjit Singh had recruited her to do. Her involvement was less than Coleman's. It was less than her partner's. And it certainly was less than both of the things. I think that she was entitled to a minor role adjustment rather than being treated as an average participant. And with that, I will yield to Mr. Warner. Thank you. Good morning, Your Honors. This is Tim Warner for Mr. Surjit Singh. On the issue, going first to the issue of the missing element in the fraud instruction, disjunctive or the conjunctive, one thing I would add is that the counsel for Mr. Surjit Singh did argue, he made the argument, to use his words, were that they did not take the money and run. So this is a situation where once the funds were received, there were a number of mortgage payments made. And so I think that in terms of the prejudice of this, it definitely affects the intent to cheat out of funds. And I think it is also significant that this is a mortgage situation where the banks are getting a note with a repayment with interest. And the argument in saying that there was no intent to take the money and run, I think that really fits in line with this element. The intent to cheat out of funds was significant in this case. And I would just add that that only goes to the counsel of the mail fraud and the bank fraud. It does not go to the making a false statement to the bank, which would not be affected by that error at all. I want to go to the issue of the... Just a minute, Mr. Warner. When you say, you know, they didn't take the money and run. Right. Another way of looking at that same circumstances, well, on the property, some properties, they made payment only for a few months. And that was sort of like a lulling action. Right. And so, you know, they still have the same intent. Isn't that a fair inference? I disagree that this would be a situation of lulling, that these payments were made. I think lulling really is in the context of the argument and the argument about the mailing instructions. But I don't think it is a lulling issue. But no matter what, the question of whether the missing element is prejudicial, I think that clearly they made that argument that there were payments made. And essentially, there was not an intent to cheat out of money that there were payments made. So it is prejudicial in that sense. On the 10 or more victims issue for Mr. Surjit Singh, there really was an incorrect assumption made that the original lenders were all victims. When the actual guidelines say that to be a victim, to get that 10 or more, you have to suffer financial loss. And there was never really a correct analysis by the court of how many victims suffered financial loss, which is significant because, as we know, lenders resold those loans. This was a game, essentially a hot potato. And there never was any finding about how many actual victims suffering financial loss. And then there were… How many banks or lenders did the colleges refer to the Sings? Did the Sings actually deal with? I believe… Directly. Right. I believe that there were, I want to say, 12 initial lenders. And there were 14 properties and 12 initial lenders. But again, we do not know. The government does say that it was foreseeable that some of these were resold. We know that that was the practice, but there was never a finding of how many of the lenders actually suffered the harm. Well, let me put it this way. To get to 10 or more, which the probation report does, I guess, do you need to include the lenders who became victims because they bought on the resale? I think that is the finding that the court would have to make. That is the question of who was holding that loan when the harm happened and how many of those individuals there are. And those could have been the persons who bought on the resale. Is that right? Yes, those… But there's no specific finding on, you know… There is not. Who bought so much or anything like that? There is no specific finding as to how many successor lenders there are. But what I would say is that we do know that only two of the lenders submitted restitution claims for what it's worth. And I think that shows that… Were those direct lenders or were they resale buyers? Or do you know? I believe my analysis was that they were direct lenders. It was Citibank, and I want to see the Morgan case. I think they were on the – in the paragraph. So no other lenders that we know submitted claims. I think that shows that this was… All right. Those are the only two lenders who submitted claims? Is that what you're saying? That is the information that I have that's in the PSR. All right. And then… Can I ask a question? Yes. With respect to 10 or more victims, that affects surgicing, right? Right. That's correct. All right. Was an objection made to the PSR at time of sentencing? Not – there was not an objection made to the 10 or more victims. That's what I thought. Yeah. Now, if no objection is made, what is our scope of review as to this? It would be a plain error review. Plain error. Right. And I think the issue of the how many actually claimed restitution goes to that this was – that there was a reasonable probability that this was something that would have affected the outcome. It's a reasonable probability standard. And again, at the time, these banks played the hot potato. We don't know how many successor lenders there were. I'm prepared to reserve any more time and pass the baton on. All right. Mr. Roden? Yes, Your Honor. In terms of very briefly on the fraud issue, I'll just point out for the record that at page 18 of our brief, citing reporter's transcript 1248, that's where you find the argument about the money in run. And counsel there specifically says that it doesn't make sense that this was their intention to defraud if they made these mortgage payments. Quote, if that bothers you, and it should, that is doubt based on a reason. And the law says you must vote not guilty. I certainly would not question Judge Tsushima's assertion or question that isn't there other evidence or sufficient evidence for which a jury could find intention to defraud. The point is simply that the argument was that, in essence, there was no intended cheating here. And that is an issue that the jury never had to reach because they never were directed that they must decide the intent to cheat as well as the intent to deceive. With that, I'll just turn to my client's sentencing argument. And I just want to emphasize the distinction, if it isn't clear from the briefs. We argue that a three-point enhancement on sentencing as a manager and supervisor was appropriate, but not an organizer and a leader. We make that argument in terms of sufficiency. The record doesn't support a four-point enhancement. But let me also make it clear that we're claiming legal error. We're saying that the imposition of the four-point enhancement is tainted by the fact that the PSR never considered or addressed the critical principle of relative culpability, relative responsibility, nor did the district court because it just accepted the PSR without comment or addressing it. I will say there cannot be a dispute that one of the three defendants in this case was the most culpable, and he was the leader of the alleged scheme. As our briefing details, Raj Singh's PSR characterized Sarjeet Singh, Raj's father, as, quote, the leader of this mortgage fraud scheme. And the government reflects that in its sentencing memoranda as to Sarjeet. He recruited the three store buyers without whom the scheme would not have been possible. He created and controlled the three shell companies in which the proceeds of the scheme were deposited. And, indeed, as Shivjyoti Rani, his daughter, and a main government witness testified, her father controlled all of the money and all of the family participants in the scheme. A three-point enhancement as a organizer and leader leads to a significant increase in sentencing range. But in this case, the salient sentencing factor of relative responsibility not addressed by the court mandates a lesser guideline range for Raj than for his father, Sarjeet. Let me just say in closing a comment on whether there might be an impression that this is an argumentative tempest in a teapot, because a sentencing court, even with a one-point reduction, could have sentenced Raj to the same amount of time. That's true. But a remand for resentencing at this time is possibly a very meaningful remedy. The Congress, the courts, the executive branch are all struggling to reduce the prison population in the face of the COVID crisis. I believe judges do and will and properly take that crisis into effect, not only to mitigate the enormous administrative burden placed on the prisons by the COVID crisis, but here's a simple fact. Prisoners now and Raj Singh was in prison for over a year pending release on appeal. Time is a lot harder. A year's time in present conditions is probably worth three or four in 2018 when the sentence here was imposed. And I also point out, and the government can confirm this, that at the time of sentencing, Mr. Singh, Raj Singh, had not paid over a million dollars to his financial obligations under this judgment, which he has since sentencing. That would be a relevant factor that the court could consider on resentencing. Let me be clear. This is not a plea for mercy from this court. I submit that Raj's legal claims on their merits mandate a remand for resentencing. Thank you. Thank you, counsel. We will hear from Ms. Bickley now. Good morning. May I please the court? Lee Bickley on behalf of the United States. I was trial counsel in this matter. With respect to the intent to defraud instruction, there was no plain error in using this court's model instruction on intent to defraud, which was proposed by the defendants, as it did not affect the defendants' substantial rights and it did not affect the fairness or integrity or public reputation of judicial proceedings. In this case, there was overwhelming evidence of the defendants' intent to cheat the banks, which is defined by this court in Miller as to deprive a victim of money or property by means of deceptions, even momentarily. Number two, the jury instructions and the verdict show that the error did not affect the jury's verdict. Number three, the defendants' primary defense concerning intent to defraud, this is this intent to repay, that was no defense at all, as this court has held in the Miller case. And even if that was a defense, there was overwhelming evidence that the defendants did not intend to repay. Let's talk about the overwhelming evidence the defendants' intent to cheat the banks. Defendants were making false statements to banks on loan applications to get money. They received over $9.3 million of loans lent by at least 12 lenders with 28 different loans. The defendants took that money. For example, Rajeshwar Singh was a seller on seven of these properties, and we traced that he received over $830,000 in just seller proceeds alone from the banks. He also received over $100,000 in real estate commissions and was relieved of over $3 million worth of debt that he owed on the seven properties that he was selling in the scheme. Sajid Singh, through the use of shell accounts, where they overvalued the properties and had money directed into shell accounts, he received over $730,000 of bank money. And Ms. Sharma received over $20,000 from the Singhs and $3,000 directly from the bank. The defendants did take the bank's money. Also, in addition, there was testimony. For example, Mr. Coleman, one of the straw buyers, testified he lied to lenders and made false statements in order to get loans. The CPA that Sajid Singh brought the straw buyers to in order to have false tax returns made and had these CPA letters generated in which he gave them word for word the money, he testified that the tax returns were needed to get loans. That's bank money. And in addition, in this case, the jury determined that the defendants intended to cheat. In convicting the defendants of bank fraud in violation of Section 1344-2, the jury specifically found that the defendants knowingly carried out a scheme or a plan to obtain money or property from City Mortgage, Citibank, JPMorgan Chase Bank, Chase Bank, or Indy Bank by making false statements or promises. That is exactly the intent to cheat as defined by this court in Miller. It is a plan to obtain money or property by means of deception. That's how the court defines cheating in Miller. In addition, beyond that jury instruction, in this case, the jury found, with the mail fraud counts, that the defendants knowingly participated, devised, or intended to devise a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. Now, this is very similar to the language that Miller relied on in terms of finding harmless error in that case. In addition, the jury had to find that the lies and false statements that all the defendants were making had a natural tendency to influence or was capable of influencing a person to part with money or property. The jury instructions taken as a whole in this case show that the instructional error did not affect the outcome of the proceedings. The defendants just have not made their burden in this case. In addition, as I mentioned, the Miller case specifically holds that intent to repay is not a defense. Miller states that the court knows of no case that holds that the fraud statute requires an intent to permanently deprive the victim of money. That's in footnote 10 of Miller. The defendants cite no case that supports their theory. And then if we look, even if that was a defense, the evidence was overwhelming that the defendants, all three of them, had no intent to repay the banks. Rogersworth sold seven properties and told one seller that the market was going down. That's at SDR 434-35 and 783-784. One property he obtained on December 6th. The next day he signed a purchase agreement with Anita Sharma to sell it to him. The defendants did not believe that the market was going to go up and everyone was going to make their money. If you look at the financials in this case, the rental payments did not nearly cover the mortgage payments. The income of the straw buyers, Anita Sharma was making $35,000 a year, and yet she took out over $4 million in loans. It was impossible for her to make the mortgage payments. In addition, she told the FBI that she did not intend to make the mortgage payments. And then I believe, Judge Tashima, you had asked about this three to four months of mortgage payments. There was evidence in this case that they were made at lulling. There was testimony that if payments were not initially made, that would raise red flags for the banks. And that testimony can be found at SDR 753 to 55, 757 to 59, 793 to 94, 214, and 325. And, in fact, in the PSRs, I'm just looking at Surjit Singh's PSR, it specifically finds Surjit Singh discussed, directed the straw buyers or one of his associates to make multiple mortgage payments on the properties for a limited amount of time. This was done in an attempt to conceal the scheme from lenders by preventing immediate default on the fraudulent loans. In doing so, the defendants made it more difficult for the lenders and investigators to detect the scheme. That's paragraph 13 of the PSR. So this exactly was a lulling scheme. Defendants in this case have just not met their burden of showing prejudice. What do you make of the argument that Surjit and Raj were not equally culpable and should not have both been held to be organizers of a criminal activity involving five or more participants? It does seem to me that Surjit did have a greater role in organizing and putting all the pieces together of this mortgage fraud. Yes, Your Honor, as you well know, there can be more than one leader and organizer of the scheme. What was telling to me at the trial, Mr. Coleman testified that Surjit Singh was instrumental in getting all of his loans. When asked what Rajaswar Singh's role was at the time, he testified the same. That's at SCR 514. Here the court found correctly and did not clearly air that Rajaswar Singh had decision-making authority in this case. He was the licensed real estate agent. He was in charge of collecting the backup materials to support the loan applications. He and Surjit found the homes for Coleman to buy. Rajaswar decided which lenders would be used in this case. He also exercised decision-making over all of the money flow in this case. He was the escrow officer's only point of contact. So he was the individual who was directing money, not only to the shell accounts, but also to his mother who was a seller, to his sister who was a seller, who was determining which one of his family members was going to be getting the money. In addition, he recruited accomplices in this case. For example, Shalandra Singh, who was both a straw buyer and a buyer, he recruited. He recruited his wife, Kamlesh Singh, who was a seller. And he also helped recruit Coleman with his father. For example, Coleman testified Surjit and Rajaswar came to his house to discuss refinancing his home and later found three other homes for him to buy. When Mr. Coleman was asked whose idea it was to purchase the three homes, Coleman testified, it was Surjit Singh's and Raj Singh's idea. He also claimed a large right to the fruits of the scheme. For example, as I said earlier, he made over $830,000 in just seller proceeds and over $109,000 in real estate commissions. Every transaction he was making money on because he was the loan officer. He had a big role in terms of directing where that money went to. And his skin was in the game, as we say, in every single one of these transactions. Assuming that's right. Didn't Sharma have a relatively minor role in light of all of that? Your Honor, that's just not what the court found in this case. And the court did not clearly air. She was an average participant. Did she have the role of Rajeshwar Singh? And did she have the role of Surjit Singh? No. And that's reflected in the differences in their sentences. Rajeshwar and Surjit Singh were sentenced to over 130 months. Ms. Sharma was sentenced to 46 months. So her role was reflected. But Ms. Sharma, as Judge Burrell found, was an average participant. The judge specifically found in a written opinion that she understood the scope and structure of the criminal activity, that the nature and extent of her participation in the commission of the criminal activity was great, and she also stood to benefit from the criminal activity. The court found it is collusive that Sharma understood the scope and structure of the activity. The court specifically found that she repeatedly lied to get loans from lending institutions for the purchase. She purchased five houses in the scheme over six months. Again and again she lied. In addition, she knew it wasn't just signing a loan application. She signed documents of her intent to move to Sacramento, another letter intent to move to Elk Grove, another letter about her made-up business and all of the money she was getting from it. She went to the CPA. She actually confirmed to the CPA her income and employment. She also knew that Roger Swercing was the broker for these transactions, and he was a seller in the scheme. So she was aware of the overall scope. She also knew that her boyfriend, Satnam Satnam, had been a straw buyer himself. The court also found that the extent to which Sharma financially benefited weighed in favor of her not receiving a minor role reduction. She received over $20,000 from the Singhs, and they came from various different bank accounts, showing that she knew that various bank accounts were being used. And she also received money directly from the bank. So when you look at this, obviously, not obviously, but we contend that both of these were the owners and organizers of the scheme, and that Ms. Sharma was an average participant. Then minor participants would be the sellers who signed fraudulent documents that said that they owed money, for example, to these shell accounts that Sergide and Roger Swercing were using. And some of these sellers, like, for example, Roger Swercing's mother, who in order to support the Coleman had somebody renting out his home. So those people would be the minor participants in the scheme. But a straw buyer who's purchased five homes and got over $4 million in bank money, she was an average participant. The district court did not clearly err. And going back to Mr. Reardon's point with respect to whether the court considered relative culpability with respect to Roger Swercing, it did. The court read and considered the pre-sentence report, the defendant's objections to the pre-sentence reports, the sentencing memorandum, and the United States' responses to both filings. That's an ER-45. Roger Swercing spent four pages of his objections arguing that he was less culpable of his father. The government responded in its briefing that he was a leader and organizer himself. And the PSR itself, as Mr. Reardon has told you many times, said that Swercing was the main leader and organizer in this mortgage fraud scheme. The PSR laid out the relative culpability. The court adopted the findings of the PSR. So it's just not true that the court was not considering relative culpability in this case. Can you address the deficiency of the evidence on the mail count? Yes, Your Honor. In this case, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mailings of the deeds of trust, which occurred throughout the whole scheme, sometimes before the defendants received their money, that the deeds of trust actually contained material representations about the primary occupancy of each of these straw buyers. And those material misrepresentations were made to the lender victims, which were contemplated by the defendants and were expected to be mailed by the lenders and would have raised red flags if not mailed. There was actually testimony on that. And which were provided evidence of collateral necessary to secure the loans were incident to an essential part of the scheme. In many cases, in this case, this case is very similar to this court's decision in Lowe, where deeds of trust were found to be sufficient. And it's also similar to this court's unpublished decision in United States versus Williams, which I believe, Judge Lordlaw, you were on that case, and Mr. Warner actually argued it. In that case, the court found that deeds of trust were incident to an essential part of the scheme because they provided evidence of collateral necessary to secure the loans. And that's at 7-11. Here there was testimony from the lender victims that these deeds of trust provided collateral to secure the loans. One lender witness testified that if they had not received it mailed back, which was the normal course in this process, that that would have raised red flags for the lender. So it was definitely lulling these deeds of trust. And as this court has held in egglash, that the relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later through hindsight may prove to have been counterproductive in return to haunt the perpetrator of the fraud. Here these deeds of trust on the front page all said mail to, return to with an address. It was contemplated by all of these defendants that these deeds of trust would get mailed. This was a mortgage fraud scheme. The deeds of trust were actually the mortgages. What the plan was, false statements would be made to get money from the banks to cheat them, and then in return, the banks get these deeds of trust, which everyone testified happened by mailing. So it was completely within the scheme that these deeds of trust were important and the mailings were important and essential. Could you respond to a defense counsel's argument about the lack of analysis by in terms of the number of victims? Yes, Your Honor. As an initial matter, this is a waiver issue. We strongly suggest that Sergei Tsin has waived this argument. Here he knew of his rights. With respect to challenging the loss calculation, he affirmatively asserted the loss is difficult to calculate because many of the lenders in this case sold the loans at issue. That's at ER 134 to 35. However, in that same document where he's arguing that some of the lenders may have sold the loans, he in that same document stated that a two-level enhancement for 10 or more victims was appropriate. He actually did his own calculation, and in that calculation, there's a line that says that two-plus enhancement should be applied, and that's at ER 147 to 48. ER 147 to 48. He waived his right to challenge the number of victims for the enhancement. But in addition, here the court had before it deeds of trust, calculations with respect to we had 14 properties, 28 different loans were at issue in this case, and the court found that there were 10 or more victims. The parties proceeded with this understanding that there were 12 or more victims. The documents in front of the court were reliable. There was no indicia that they were not reliable, and the court did not plainly err, especially when there was absolutely no argument on the fact that there were fewer than 10. The court adopted the findings of the PSR and determined that there were 14 properties with 28 loans and that there were at least 10 victims. And with respect to that argument, I would ask the court to look to the Sixth Circuit's decision in Zundel. In that case, the Sixth Circuit held that in each fraudulent loan transaction of which there were more than 10, someone, be it the originating lender or its and thus qualifies for the purposes of 2B1.1. And that's at page 504. In this case, obviously we're arguing waiver, but even though in plain error review, Sirjeet Singh has just not shown plain error that his substantial rights were affected. It does not show that there was a reasonable probability of a different, he has not shown a reasonable probability of a different outcome. Even if all 28 loans were resold, as he asserts, there likely would have been more victims in this case. He cites this case Engleman to talk about securitization. And in that case, there would be more and more investors. We might have been victims if that were the case. But at this point of plain error review, it's his burden. And for all he talks about hot potato, there is nothing in the record in this case that this was a hot potato situation. We have banks like JPMorgan Chase, City Mortgage, who say that they kept these loans. So what Mr. Sirjeet Singh is relying on here is just pure speculation. And given that it's his burden, he just does not meet that burden. Well, does the record show, like, or the probation report show, like, how many loans were there, 28 loans? How many of these loans were resold? No, it does not. So do you know from the 10, how many victims would you say there were in this case? When you say 10 or more, how many are you talking about? At least 12, Your Honor. And that's what the PSR says. All right, if there are 12 victims, do you know how many of those were, you know, became victims by virtue of being repurchases of mortgages? No, Your Honor. The only testimony that we could find was that, and it was the testimony from a Chase witness who testified that probably one of the loans was resold, but that Chase kept the other loans. So consequently, on the record here, there would have been at least 13 victims. And in this case, where there was no challenge to this factual dispute, it was reasonable for the court to rely on the information that was in front of it, and the court did not plainly err with respect to that. Thank you. Thank you. I know that Ms. McClintock mentioned suppression. If the court has any questions with respect to that, I'd be happy to answer those questions at this point. Does anybody have any further questions? Judges? I have no more. Thank you. Thank you. So unless were there any other questions, we ask that this court affirm both the convictions and the sentences for all the defendants in this case. Thank you for your time. Thank you, counsel. Counsel went over time a bit, so I'll give you each a minute to sum up for your client. Thank you, Your Honor. This is on behalf of Ms. Sharma. I think Ms. Bickley makes our point on the substantial right that she was denied by the instructional error on the fraud count. As Ms. Bickley said, it was impossible for Ms. Sharma to make the mortgage payments, and it was clear from her statement in the FBI that she was relying on the SIGs to do so, or at least surrogate SIGs to do so. So her intent from the beginning was to gain equity in-house, lie about the paperwork to get the loan, and she acted like a straw buyer. It goes to both a substantial right of being denied a jury verdict on that, and it also goes to the fairness and integrity of the system. So I think you need to overturn, even under the plain error standard, the fraud. Regarding the minor role, I just want to say that I would just refer you back to our reply brief on page 14. I'm sorry. The other thing that I wanted to say about the fraud was the government's reliance on the Miller case, as we pointed out in the brief, is inapplicable, because Miller was – he wasn't – he was basically embezzling from his company, and that's a different crime than what was happening here. So I think that it's legally distinguishable from the kind of intent involved in our case. And as far as the minor role, I think we already addressed the points she made in our reply brief on page 14, and I will sit down. Thank you. Great. Thank you, counsel. Mr. Warner? Thank you, Your Honors. Just on the issue of leadership, I do take issue with presenting Surgeon Singh as the lord of this whole thing. The fact is that the daughter said that both the father and the brother were controlling this. I would add that Rajeshwar Singh really is the person with the real estate knowledge and who had the license. I think that this isn't a case where there is a – I think this is a close call because there are not clearly delineated divisions of responsibility like some larger organizations. So I think it is significant. And I think that if Surgeon Singh's case should go back because there was no finding, Rule 32 finding, about this issue of preparing the loan documents, which looks like it's Rajeshwar's purview. So I think it should go back, and it should go back for relative culpability as well. Just to address the issue of lulling, I don't think this is lulling because what would have been found had they gone back to the recorder's office? This was not an ongoing relationship, and it was not like Lowe where they were trying to hide this deed back, this deed back to the original person. There's just nothing that they would have found. So it's not a lulling circumstance because it's not an ongoing relationship. The banks would have just – it's recording of the deed that is significant. It's not getting the thing back in the mail. They could have got it from the recorder's office. Thank you. Thank you. Mr. Reardon? Your Honors, in one minute, at page 5-7 of our opening individual brief, the government in its sentencing memorandum of Surgeon Singh said he planned and organized the offense and controlled others in their participation. It said Serjeet, quote, recruited Satnam, Satnam, Anita Sharma, and Dwayne Coleman to this scheme. It said that Serjeet directed Sharma's activity. It said that Serjeet Singh directed Coleman's activity. And its own witness said that Serjeet controlled all of the finances pertaining to the properties. The government has conceded, one, that the defense argued this point vociferously at sentencing. It has conceded implicitly that the court said nothing about it at sentencing. The only way to ensure that the fact of personal and relative responsibility is adequately considered is to remand, at a minimum, to remand for reconsideration of that factor by the district court. Thank you. Thank you, counsel. United States v. Sharma, Singh, and Singh is submitted. And this session of the court is adjourned for today. Thank you.
judges: Tashima, Wardlaw, Bea